# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| NLRK, LLC, | Case No.: 3:21-cv-00073-CSD |
| Plaintiff | **Order** |
| v. | Re: ECF No. 61 |
| INDOOR AG-CON, LLC, NANCY HALLBERG, KRIS SIERADZKI, and BRIAN SULLIVAN, | |
| Defendants | |

| |
|---|
| INDOOR AG-CON, LLC, NANCY HALLBERG, KRIS SIERADZKI, and BRIAN SULLIVAN |
| Counter-Plaintiffs |
| v. |
| NLRK, LLC, |
| Counter-Defendant |

Plaintiff NLRK, LLC (NLRK) filed this action for breach of contract against Indoor Ag-Con, LLC (Indoor), Nancy Hallberg (Hallberg), Kris Sieradzki (Sieradzki), and Brian Sullivan (Sullivan). (ECF No. 1.)[1] Indoor, Hallberg, Sieradzki and Sullivan assert counterclaims against NLRK for breach of contract; fraudulent misrepresentation/omission; theft of trade secrets in violation of NRS 600A.010, *et seq.*; unlawful acts regarding computers in violation of NRS 205.4765; and trespass to chattels.

---

[1] NLRK also asserted a claim under Nevada Revised Statute (NRS) 31.840, *et seq.*, for claim and delivery; however, NLRK appears to have abandoned that claim as it is not referenced in NLRK's proposed findings of fact and conclusions of law. (ECF No. 90.)

The parties consented to the undersigned presiding over this matter for all purposes. (ECF No. 58.) Pursuant to stipulation of the parties, the court conducted a bench trial on April 11 and 12, 2023.[2] Based on the evidence presented at trial, and the proposed findings of fact and conclusions of law submitted by the parties (ECF Nos. 90, 91), the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1):

**FINDINGS OF FACT**

**A. Parties and Relevant Non-Parties, Jurisdiction and Venue**

1. NLRK is a limited liability company in Nevada, and its sole member is Nicola Kerslake (Kerslake), who resides in Reno, NV. Newbean Capital (Newbean) is a registered dba of NLRK.[3]

2. Indoor is a limited liability company in Nevada with three members: Hallberg, Sullivan, and Sieradzki. Hallberg resides in Florida. Sullivan resides in Connecticut. Sieradzki resides in Georgia.

3. Non-party Contain, Inc. (Contain), is a Nevada corporation formed by Kerslake in 2015. Contain is a fintech platform for indoor agriculture and serves as a broker for farming equipment. Contain has never hosted indoor agriculture events, and there is no expectation it will do so in the future.

---

[2] The only pretrial motion filed was a motion *in limine* by NLRK to preclude Counter-Plaintiffs from presenting evidence, testimony or argument regarding any damages other than nominal damages as a result of their failure to provide a computation of damages under Federal Rule of Civil Procedure 26(a)(1)(A)(iii). The court granted the motion insofar as Counter-Plaintiffs were precluded from presenting evidence or argument with respect to any pecuniary damages at trial, but the court denied it insofar as they were permitted to seek non-pecuniary damages in an unspecified amount at trial as long as they demonstrate they are entitled to recover such damages with respect to a particular claim. The motion was also denied insofar as they seek punitive damages, assuming they demonstrate a legal basis for such an award. (ECF No. 76.)

[3] NLRK and Newbean were used interchangeably during the trial.

4. Suzanne Pruitt started as the marketing manager for Indoor after the acquisition, and she is currently the event director and oversees sales and marketing for Indoor.

5. Jim Pantaleo was hired by Indoor to develop topics and get speakers for events, and for a period of time, exhibit and, attendee sales.

6. The court has jurisdiction under 28 U.S.C. § 1332, and venue is proper in the District of Nevada under 28 U.S.C. § 1391(b).

**B. NLRK and its Indoor Ag-Con Business**

7. Kerslake formed Newbean in 2013 as a registered investment advisor that manages venture capital mandates. Newbean developed expertise in the State Small Business Credit Initiative (SSBCI), a U.S. Treasury program that encourages access to capital in local communities.

8. In addition to managing venture capital mandates, Newbean became involved in hosting and managing events and conferences in the indoor agriculture industry. It hosted one event in Las Vegas in 2013, two events in 2015, and three events a year from 2016 to 2018. This part of the business was known as Indoor Ag-Con.

**C. Negotiations for the Sale of Indoor Ag-Con**

9. Though Kerslake had an interest in the indoor agriculture industry, she had no interest in running an event business, and she decided to explore the sale of Indoor Ag-Con so she could focus on Contain's business.

10. Kerslake was introduced to Hallberg through a business broker, Eddie Ryan, around March 2018. Hallberg was very interested in the emerging indoor agriculture industry, and she expressed an interest in acquiring Indoor Ag-Con from NLRK. Hallberg contacted Sullivan about whether he was interested in the potential acquisition with her.

11. The parties went through due diligence, and the potential buyers were required to sign a non-disclosure agreement. Despite some concerns expressed by Sullivan, the parties moved forward with the deal.

12. NLRK created Indoor Ag-Con, LLC, a wholly owned subsidiary of NLRK, and the assets of NLRK's indoor agriculture event business were assigned to Indoor Ag-Con, LLC for purposes of the sale.

**D. The Purchase**

13. The parties entered into three agreements: (1) a Membership Purchase Agreement; (2) a Security Agreement and Secured Promissory Note; and (3) a Consulting Agreement.

14. On December 4, 2018, Hallberg, Sullivan, Sieradzki, and NLRK entered into the Membership Purchase Agreement for the sale of the entirety of the membership interest in Indoor Ag-Con, LLC.

15. In exchange for the membership interest, Hallberg, Sullivan, and Sieradzki agreed to pay a purchase price that included the following components: (1) $150,000 in cash at closing; (2) $300,000 backed by a secured promissory note providing a security interest in defined collateral, split into three payments of $100,000, to be made on June 1, 2019, June 1, 2020, and June 1, 2021; and (3) post-closing payments where, for three years after the closing of the deal, Indoor would provide NLRK with an accounting of each event hosted within two weeks of the conclusion of each event, and Indoor would pay five percent of the gross profits from each event to NLRK.

16.  The collateral referred to in the Security Agreement and promissory note consists of all tangible and intangible assets of Indoor owned at the time of the agreement and thereafter acquired, together with all proceeds thereon.

17. Under the Consulting Agreement, Indoor agreed to engage NLRK to provide certain consulting services in connection with the indoor agriculture events Indoor was hosting between December 4, 2018, and October 1, 2021.

18. Under the Consulting Agreement, NLRK agreed to commit at least ten hours per week providing the following services: develop event agenda and event topics; facilitate introductions to trade show exhibitors, speakers, scientists, government authorities, and other event attendees and the transition of key conference supporters and speakers that were previously engaged in prior events; serve as liaison between Indoor and trade show exhibitors, speakers, scientists, government authorities, and other event attendees; assist in establishing exhibit sales and sponsorships; create the copy for at least one white paper[4] per year under the Contain brand name, launch at the event and provide the copy of the white paper exclusively to Indoor for a period of at least one month after each event; assist in search and selection of directors and advisors for Indoor; and attend each event hosted by client and host such event with client, if requested by client.

19. In exchange for providing these services under the Consulting Agreement, Indoor agreed to pay NLRK $2,000 per month on the first business day of each month. In the event of a late payment, interest could be charged in the amount of 1.5% per day.

20. Indoor had the right to terminate the Consulting Agreement if NLRK failed to demonstrate the ability to fulfill the agreement, if NLRK failed to timely or accurately provide the services required, or if NLRK violated the confidentiality provision of the agreement.

21. NLRK had the right to terminate the Consulting Agreement if Indoor did not pay an outstanding undisputed invoice within 45 days of receipt or if payment was not made within 10

---

[4]There was testimony that a "white paper" is a 20 to 30-page "deep dive" into a specific topic.

days of the due date and an alternative payment arrangement was not mutually agreed upon in writing.

22. Either party could terminate the Consulting Agreement without cause with at least 30 days written notice to the other party.

**E. The List**

23. When she contemplated selling Indoor Ag-Con, Kerslake viewed the assets as including: the brand and its collateral, the relationship built with the indoor agriculture community, the website and associated domain and search engine optimization (SEO), some physical assets such as table runners to set up for a trade show, as well as a client/email list.

24. A list of Indoor Ag-Con's assets that was prepared prior to the sale included, among other things: an email list, a newsletter archive held in a GetResponse account, as well as Google sheets with lists of the names and email addresses of prior exhibitors, participants, speakers and sponsors.

25. Kerslake testified the client list was a Google sheet with names, email addresses, and sometimes a company name for anyone who bought a ticket, booth, or sponsorship for an event. The email list contained an email and maybe a name or company name. The email addresses were gathered when someone signed up at the website or gave a business card. These items were often referred to collectively as "the list."

26. Kerslake did not view the list as proprietary or the main asset of the business, and according to her, it was not a significant part of the discussion during the sale negotiations. Instead, she claims the potential buyers were concerned about knowing the indoor agriculture industry, its key players, and where Kerslake saw the potential for events. Hallberg and Sullivan, on the other hand, viewed the list as the primary asset. Sullivan referred to the list as the "gold,"

and both Hallberg, Sullivan, and Pruitt spoke to the importance of such lists in the tradeshow industry.

27. In due diligence, Kerslake provided Hallberg and Sullivan participant lists for the Las Vegas event in 2018, the Singapore event in 2018, and the Philadelphia event in 2017; a sponsor list with the amount paid and benefits for the Las Vegas 2018 event; a screenshot of the GetResponse account mailing list which showed more than 7,500 opt-in contacts; examples of weekly newsletters; and links to social media feeds, including Twitter, Facebook, and Instagram.

28. Sullivan expressed concerns regarding the quality of Kerslake's list, and at one point characterized Kerslake's list as "trash." Despite Sullivan's concerns, the buyers moved forward with the deal.

29. For the email list, NLRK had a GetResponse account which it had maintained for several years. GetResponse is a mailing list provider where lists can be added into the account and newsletters and other marketing materials can be created to send out to the lists.

30. After the sale, Kerslake gave Indoor employee Suzanne Pruitt administrative access to the GetResponse account. Kerslake advised Indoor's tech staff that the credit card on the GetResponse account would need to be changed.

31. Once the purchase went through, Pruitt went through the list and figured out how to clean it up and enhance it so it would be more valuable for the industry.

32. NLRK's GetResponse account had information unrelated to Indoor, including lists for Contain and for other NLRK projects. Kerslake told Pruitt on February 18, 2019, that she aimed to get the Contain list removed from the GetResponse platform that week.

33. On February 20, 2019, Kerslake sent Pruitt an email stating that under the agreement, NLRK was to retain access to the mailing list in case "we want to use it for Contain." Kerslake

also advised Pruitt that she would get the Contain list transitioned out of the GetResponse account by the end of the week. Pruitt responded, "Great, thank you Niccola [sic] - - In checking with GetResponse, that still didn't get me the access level for billing unfortunately. …"

34. In April 2019, Jim Panteleo was asked by a potential exhibitor whether Indoor would share the attendance list from the tradeshow the year prior. When Sullivan was confronted with the issue, he pointed out that "Nicola [Kerslake] and Jim [Pantaleo] [had] been in the trade show game as long as" Sullivan and Pruitt. Sullivan said: "We do not want the list out to anyone and that includes Nicola and Jim unless we chat. Nicola lists are trash and now that we are building a correct list the value will be high. Don't want to immediately start killing the lists."

35. Contain got its information off of the GetResponse account.

36. Kerslake testified that there were lists for Indoor that were shared lists and were left on the GetResponse account so Pruitt could access them. In addition, under the Consulting Agreement, Kerslake was required to access the GetResponse account on several occasions.

37. No one ever told Kerslake there was not a shared list. However, Hallberg and Sullivan maintain they never would have agreed to share the list. The purchase agreement documents do not mention the list.

38. After Kerslake gave Pruitt administrative access to the GetResponse account, Pruitt had the ability to see who else had access to the account and to revoke access to the account. She did not revoke Kerslake's access to the GetResponse account after Sullivan's email advised that Kerslake should not have access to the list.

39. Pruitt did not revoke Kerslake's access to the GetResponse account until late December 2020 or early January 2021[5], after Pruitt received an email in December 2020 that she believed suggested the list was utilized by Contain to contact people that were not on Kerslake's original list. The email contained a sentence stating: "We retained this mailing list during our disposal of Indoor Ag-Con LLC. We hope you choose to stick around, but you're of course welcome to unsubscribe from the list at any time using the below links." No evidence was presented, however, that provides a comparison of who was on Kerslake's original list versus who was on Indoor's enhanced list.

40. Sullivan testified there was an unwritten policy limiting access to the list, but he admits that policy was never conveyed to Kerslake.

41. Sullivan also acknowledged that despite this unwritten policy, Kerslake had access to the list until well after Indoor terminated the Consulting Agreement.

**F. End of the Relationship**

42. On March 26, 2020, Kerslake got a call from Hallberg and Sullivan and they told her they were furloughing all staff because of the COVID-19 pandemic. Kerslake reminded them that she was not staff, and they could not dismiss their agreement. They said they would get back to her with a way forward.

43. Sullivan sent an email to Kerslake on April 9, 2020, stating that they received her April 2020 invoice, but Indoor was "holding off on all contract payments while we and the balance of the world figure out the next steps due to the COVID-10 pandemic. We plan to restart

---

[5] This was some five months after Indoor sent written notice it was terminating the Consulting Agreement.

when the atmosphere of the situation becomes conducive." He also requested a 2018 tax return for Indoor to be used to apply for a loan.

44. In response, Kerslake advised Sullivan she had learned of the cancellation of Indoor's upcoming event through the media. She reiterated that Indoor was contractually obligated to make the payments, but she indicated her willingness to work with them to propose a payment plan. She also asked Sullivan to confirm they would be making the $100,000 milestone payment due on June 1, 2020, and requested a plan to hold the three events per year, and that she had engaged in efforts to assist Pruitt in having the events virtually. In addition, she noted they were awaiting the accounting from the 2019 Las Vegas event. Finally, she informed him that Hallberg had filed the 2018 tax return for Indoor.

45. In his response on April 18, 2020, Sullivan asked whether Kerslake was sure she had fulfilled her contract terms "100%." He again requested Indoor's 2018 tax return. He communicated that it was their understanding they committed to holding two, and not three, events, and indicated that COVID-19 had halted the event industry, but they were working to find a way to hold the events in 2020.

46. On June 2, 2020, Kerslake wrote to Hallberg to ask about the arrears owed in the amount of $108,000, consisting of the $100,000 milestone payment that was due June 1, 2020, as well as the $2,000 monthly consulting fee for the months of March through June of 2020. She also stated that she had not received any projects for work for Indoor Ag-Con under the Consulting Agreement.

47. On July 17, 2020, Sullivan sent Kerslake an email giving 30-days' notice of the termination of the Consulting Agreement. The letter asserted that NLRK had not timely met its obligation to provide the services promised and refused to cooperate with certain requested items

in breach of the agreement. Kerslake did not respond, and Sullivan sent several emails to follow up.

**G. Performance/Non-Performance under the Agreements**

    **a. $150,000 Cash Payment**

    48. NLRK received the initial payment of $150,000 a week after closing in December of 2018.

    **b. Payments under the Security Agreement and Secured Promissory Note**

    49. NLRK received the first installment payment of $100,000 under the Security Agreement and Secured Promissory Note in June 2019. It did not receive the remaining $200,000.

    **c. Post-Closing Payments of Five Percent of Gross Profits for Each Event Held in the Three-Year Post-Closing Period**

    50. During the three-year post-closing period, Indoor held events in Singapore, Las Vegas, and Orlando.

    51. NLRK received the five percent post-closing payment for the January 2019 Singapore event. Kerslake provided the accounting for that event at Indoor's request since the event took place so soon after closing the deal. She provided Hallberg and Sullivan with a spreadsheet as well as a link to a Box folder with receipts. The spreadsheet also detailed other expenses owed, including consulting fees and attorney's fees in connection with the sale that the parties had agreed to split.

    52. NLRK did not receive an accounting or payment of five percent of gross profits for the Las Vegas or Orlando events despite Kerslake's requests.

///

**d. Consulting Agreement**

53. Under the Consulting Agreement, NLRK was to receive $2,000 a month for providing the services outlined in the agreement. Kerslake testified she is owed the $2,000 monthly payments for March through August of 2020.[6]

54. Indoor claims that NLRK did not provide the agreed upon services.

55. NLRK provided two white papers in 2019, for the events in Singapore in January and in Las Vegas in May. In 2020, she was engaged with Pruitt in preparing a white paper on insects for the upcoming event. She completed the white paper and produced receipts for payments that were made to an independent contractor, but the event never happened and Indoor never requested the white paper.

56. For the events in 2019 and 2020, Kerslake worked with the team to develop the event agenda and create event topics. She made introductions to anyone requested by Indoor, and she went and found speakers and encouraged them to speak at the events. Kerslake introduced Hallberg to people in the industry, to government agencies and exhibitors, and helped introduce sales and sponsorships. Kerslake attended the Singapore and Las Vegas events in 2019. She made a blanket introduction to show exhibitors, speakers, scientists, etc., after the sale, and she made individual introductions as requested. Kerslake provided names of potential sponsors, and she contacted speakers for the Las Vegas 2019 event.

57. Hallberg and Sullivan both agree that Kerslake did a lot of work on the Singapore event: she assisted with the speakers, introduced Hallberg and Sullivan to a lot of people there,

---

[6] NLRK's proposed findings of fact and conclusions of law state that NLRK was not paid for services provided from March 1, 2021 through July 1, 2021. However, this appears to be a typo because Indoor sent notice terminating the agreement in July 2020, and the exhibits referenced are in 2020 and not 2021.

and acted as the emcee for the event. She also worked on the May 2019 Las Vegas event, and Hallberg acknowledges that Kerslake helped with topics, and she hosted a panel at the event.

58. According to Hallberg and Sullivan, Kerslake never assisted in establishing exhibit sales and sponsorships. In March 2019, Hallberg emailed Kerslake stating that the consulting agreement included contacting and securing sponsors and exhibitors and said she hoped that Kerslake and Jim Panteleo could push this forward to get a good base of exhibitors.

59. Kerslake emailed Hallberg on April 10, 2019, with a North American greenhouse list, reference to a list of potential alternate industries to approach, discussed a social media campaign, as well as a referral of potential sponsors/exhibitors and speakers. She encouraged existing sponsors to remain.

60. Kerslake provided some informal suggestions for directors or advisors, but during this time, Indoor had not put together an advisory board.

61. Kerslake generally participated in weekly meetings with Indoor team members on Fridays through March or April 2020.

62. In November 2019, Kerslake was communicating with Pruitt through the Slack messenger program regarding ideas for the Las Vegas 2020 show, including updating a presentation that was used for the Singapore show, and offering information for speakers. Kerslake and Pruitt continued to collaborate with ideas for the Las Vegas event into January of 2020.

63. Sullivan believed that Kerslake's performance waned in 2019. However, he acknowledges that Hallberg expressed her appreciation to Kerslake at the end of 2019 for all the work she had done and said that "2020 will be a banner year for Indoor Ag Con."

64. Sullivan and Hallberg accused Kerslake of interfering with the acquisition of an internet platform. Kerslake came to find out they were referring to Indoor's attempted acquisition of a company called iGrow in order to enhance Indoor's list of contacts within the indoor agriculture industry. iGrow consolidates press releases and other content from within the indoor agricultural industry to send out in a newsletter and post to its blog. iGrow also buys and sells used container farms. In the spring 2019, Hallberg discussed Indoor's potential acquisition of iGrow with Kerslake, and Kerslake told her that she thought it was a good idea. In October 2019, Kerslake wanted to potentially acquire iGrow's equipment trading business in California. She viewed this as completely unrelated to Indoor's event business, and she advised Sullivan of this. The deal did not work out for either party.

65. Sullivan and Hallberg asserted that Kerslake advised noncompliance with agreement points for Enterprise Singapore officials that resulted in loss of sponsorship revenues for 2020. Enterprise Singapore, a Singaporean government agency, was the main sponsor of the May 2019 Singapore event. The full amount of the sponsorship was paid out after the 2019 event direct to Sullivan, and Sullivan never came to Kerslake and said there was an issue with Enterprise Singapore in terms of sponsorship for a 2020 event.

66. Sullivan and Hallberg claimed that Kerslake accepted speaking engagements with competing agriculture trade shows and conferences without discussion of the potential impact on Indoor and in violation of a non-compete agreement. Kerslake testified that she only spoke at one event for ID Capital in Singapore, and Hallberg and Sullivan were aware of it and viewed it as positive because she would promote Indoor at the event.

67. Sullivan and Hallberg asserted there was an unauthorized removal of funds from Indoor's bank account after the deal closed. However, NLRK owned that account, and when

NLRK owned Indoor Ag-Con, it operated as a project of NLRK and so the funds went through NLRK's accounts.

68. Hallberg and Sullivan testified they learned after the deal closed that there were outstanding debts owed by Indoor Ag-Con. However, they never asked Kerslake about these debts or gave her the bills. Documentation of these alleged debts was not produced in discovery in this action; and they acknowledge the buyers did not assume any debts as part of the sale.

## CONCLUSIONS OF LAW

**A. Breach of Contract**

To prevail on a breach of contract claim in Nevada, a plaintiff must prove: (1) the existence of a valid contract, (2) a breach of the contract, and (3) that the breach caused damages. *Iliescu, Trustee of John Iliescu, Jr. & Sonnia Iliescu 1992 Family Trust v. Regional Transp. Comm'n of Washoe Cnty.*, 522 P.3d 453, 458, 138 Nev. Adv. Op. 72 (Nev. App. 2022) (citing *Saini v. Int'l Game Tech.*, 434 F.Supp.2d 913, 919-20 (D. Nev. 2006); *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal.2d 822, 69 Cal. Rptr. 321, 442 P.2d 377, 381 (1968)).

**1. Membership Interest Purchase Agreement (NLRK vs Hallberg, Sullivan and Sieradzki and Hallberg, Sullivan and Sieradzki vs NLRK)**

NLRK alleges that Hallberg, Sullivan, and Sieradzki materially breached their obligations under the purchase agreement by failing to provide an accounting and five percent gross profits due for the post-closing events.

Hallberg, Sullivan, and Sieradzki argue there was no meeting of the minds because they were fraudulently induced to enter into the agreement.

To establish fraudulent inducement, they must prove by clear and convincing evidence each of the following elements: (1) NLRK made a false representation; (2) that it knew or should

have known was false; (3) NLRK intended to induce them to consent to the formation of the

contract; (4) they justifiably relied on the false representation; and (5) they were damaged as a

result of that reliance. *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009,

1018, 120 Nev. 277, 290 (2004).

There was no evidence that NLRK made any false representation about the list and

whether it would be shared or retained by NLRK. Nor was evidence presented that Hallberg,

Sullivan, and Sieradzki were damaged as a result of relying on any alleged false representation.

Instead, the evidence reflects that Sullivan commented that he was concerned about the quality

of Kerslake's list, but he proceeded with the purchase of Indoor anyway. In addition, Indoor

allowed NLRK to have access to the GetResponse account despite having an unwritten policy

that would limit access to the list and well after Indoor terminated its relationship with NLRK.

To the extent Hallberg, Sullivan, and Sieradzki argue they were fraudulently induced into

the agreement because there was an omission that NLRK had outstanding debts, the court rejects

this argument. The testimony established that the members of Indoor never asked NLRK about

these invoices, nor were the invoices produced in discovery in this action, or presented at trial.

Moreover, there was testimony that Indoor did not assume any debts that may have existed prior

to the sale as part of the deal.

Hallberg, Sullivan, and Sieradzki appear to argue in their proposed findings of fact and

conclusions of law that the doctrine of unclean hands should apply to preclude NLRK from

prevailing on its breach of contract claim. "The doctrine of unclean hands derives from the

equitable maximum that he who comes into equity must come with clean hands." *Truck Ins.*

*Exchange v. Palmer J. Swanson, Inc.*, 189 P.3d 656, 662, 124 Nev. 629, 637 (2008) (internal

quotation marks and citation omitted). "The doctrine bars relief to a party who has engaged in

improper conduct in the matter in which that party is seeking relief." *Id.*; *see also Las Vegas Fetish & Fantasy Halloween Ball, Inc. v. Ahern Rentals, Inc.*, 182 P.3d 764, 766, 124 Nev. 272, 275 (2008). In other words, "[t]he unclean hands doctrine closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Adler v. Federal Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir. 2000) (internal quotation marks and citation omitted).

NLRK is not seeking an equitable remedy, but monetary damages. Therefore, the doctrine of unclean hands does not apply. *See Reed v. AMCO Ins. Co.*, 3:09-cv-0328-LRH-RAM, 2012 WL 556265, at *2 (D. Nev. Feb. 21, 2012) (where plaintiff was not seeking equitable relief, and his claims were all contractual in nature and he sought only monetary damages, the unclean hands affirmative defense did not apply); *D.E. Shaw Laminar Portfolios, LLC v. Archon Corp.*, 670 F.Supp.2d 1262, 1273 (D. Nev. Aug. 6, 2008) (finding unclean hands doctrine likely does not apply to legal as opposed to equitable claims in Nevada).

It is undisputed that the Membership Interest Purchase Agreement provides that NLRK shall receive a five percent allocation of gross profits from each event held by Indoor for three years following the closing date. At trial, evidence was presented that NLRK that provided the accounting for the 2019 Singapore event, and NLRK was paid the five percent gross profits for that event. Kerslake testified that NLRK was not provided with an accounting, nor five percent gross profits for the Las Vegas and Orlando events.

Hallberg, Sullivan, and Sieradzki allege that NLRK breached the Membership Interest Purchase Agreement because the client list was an asset transferred with the sale of Indoor Ag-Con, and NLRK retained and improperly accessed the list, and as a result, the confidentiality and value of the list were compromised and diminished.

Under the Membership Interest Purchase Agreement, NLRK, as the sole member of Indoor Ag-Con, agreed to sell the buyers 100 percent of the membership interest in Indoor Ag-Con. The list is <u>not</u> mentioned in the Membership Interest Purchase Agreement. Nor does the Membership Purchase Agreement impose any duty or obligation on NLRK regarding the list. Therefore, Hallberg, Sullivan, and Sieradzki's breach of contract claim against NLRK under the Membership Interest Purchase Agreement fails.

The court will now address NLRK's damages for the breach. NLRK argues that it should recover $69,500 for the breach of the Membership Interest Purchase Agreement. NLRK explains that Kerslake testified the estimated value of these post-closing payments was $278,000, but it seeks to recover only $69,500, because it reduced the $278,000 figure by 75 percent to account for the COVID-19 pandemic and Indoor's inability to host live events in 2020.

"Damages from a breach of contract should be such as may fairly and reasonably be considered as arising naturally, or were reasonably contemplated by both parties at the time they made the contract." *Conner v. Southern Nevada Paving, Inc.*, 741 P.2d 800, 801, 103 Nev. 353, 356 (1987).

"[A] money damage award must be supported by substantial evidence to be sustained because the law does not permit arriving at a figure by conjecture." *Commercial Cabinet Co., Inc. v. Mort Wallin of Lake Tahoe, Inc.*, 737 P.2d 515, 517, 103 Nev. 238, 240 (1987). "A plaintiff who proves a right to damages without proving the amount as well is only entitled to nominal damages." *Id*. (citations omitted); *see also Gramanz v. T-Shirts and Souvenirs, Inc.*, 894 P.2d 342, 347, 111 Nev. 478, 485 (1995) (testimony at trial provided evidence of diminution in value, but did not provide "required evidentiary basis for determining a reasonably accurate award of damages").

The court finds the $69,500 amount proposed by NLRK is not supported by substantial evidence and constitutes mere conjecture. The agreement provided that NLRK was entitled to five percent of gross profits for these two events. No evidence was presented at trial regarding the amount of gross profits Indoor made from each of these events (if any) in order to calculate the five percent to which NLRK is entitled. While Kerslake testified to the value she believed the post-closing payments would have, the agreement specified that the amount to be paid was five percent of gross profits for each event. The $69,500 amount is based on mere conjecture, and not substantial evidence. NLRK did not meet its burden of proving the amount of damages it is entitled to recover as a result of the breach of the Membership Interest Purchase agreement, and as such, is entitled to recover only nominal damages in the amount of $1 with respect to this claim.

**2. Security Agreement and Secured Promissory Note (NLRK vs Indoor)**

NLRK alleges that Indoor breached its obligations under the Security Agreement and Secured Promissory Note by refusing to pay the remaining amounts owed.

There is no dispute that Indoor failed to pay the remaining $200,000 owed under the Security Agreement and Secured Promissory Note. The court has rejected Indoor's argument that the buyers were fraudulently induced into the agreement or that the doctrine of unclean hands should preclude any recovery by NLRK. Therefore, NLRK is entitled to recover the $200,000 owed under the Security Agreement and Secured Promissory Note, plus simple interest at a rate of six percent through June 1, 2021, according to the terms of the agreement.

**3. Consulting Agreement (NLRK vs. Indoor and Indoor vs NLRK)**

NLRK asserts that Indoor breached the Consulting Agreement by failing to pay the $2,000 monthly fee due under the agreement. Kerslake testified she was not paid the consulting

fee for March through August 2020. NLRK's proposed findings of fact and conclusions of law indicate that NLRK is only seeking to recover the $2,000 monthly fee for five months: March through July. Therefore, NLRK asserts it is entitled to recover damages in the amount of $10,000 for those five months, plus interest at a rate of 1.5% per day as provided for in the Consulting Agreement.

Indoor alleges that NLRK materially breached its obligations under the Consulting Agreement because NLRK failed to provide the white paper and other services set out in the services and scope of work, such as failing to develop event agendas and event topics, failing to facilitate introductions to trade show exhibitors, speakers, scientists, government authorities, and other attendees, failed to serve as a liaison between Indoor and exhibitors, speakers, scientists, government authorities and other event attendees.

It is true that if one party materially fails to perform its contractual obligations, the other party is no longer obligated to perform under the contract. *See Goldston v. AMI Investments, Inc.*, 655 P.2d 521, 523, 98 Nev. 567, 569 (1982) (citations omitted) ("where a party is in default of obligations which must be performed prior to the performance by the other party becoming due, the first party is not entitled to claim a default by the second). The court finds in the present case, however, that the testimony and exhibits demonstrate that NLRK was performing its obligations under the Consulting Agreement and was not in breach of the agreement. Indoor only sent one email that could be construed as asserting that NLRK's performance under the agreement was deficient: Hallberg's April 2019 email asking Kerslake and Panteleo to push forward to get a good base of exhibitors. Kerslake responded to that email with various ideas and approaches. Nothing more was said on the topic of NLRK's performance under the Consulting Agreement until after NLRK requested payment and Indoor said it was postponing payments due to the

COVID-19 pandemic. For these reasons, the court finds Hallberg and Sullivan's testimony that NLRK's performance was deficient is not credible.

Indoor asserts that NLRK failed to properly document the services provided. Not only was this not a requirement under the Consulting Agreement, but Indoor tendered the previous $2,000 monthly payments to NLRK in the absence of any documentation.

Indoor argues that NLRK breached the Consulting Agreement by violating the confidentiality and proprietary clauses by retaining and accessing Indoor's list. Even assuming the list would qualify as confidential or proprietary information under the Consulting Agreement, no evidence was presented demonstrating that Indoor was damaged in any way as a result of NLRK accessing or using the list, which is a required element of a breach of contract claim.

In conclusion, the court finds: (1) Indoor's claim that NLRK breached the Consulting Agreement fails, (2) Indoor breached the Consulting Agreement when it did not pay NLRK the $2,000 monthly fee for the months of March 2020 through July 2020, and (3) NLRK is entitled to damages for breach of the Consulting Agreement in the amount of $10,000 for the months of March 2020 through July 2020, plus interest of 1.5% per day as provided for in the Consulting Agreement.

**B. Fraudulent Misrepresentation/Omission (Hallberg, Sullivan and Sieradzki vs NLRK)**

Hallberg, Sullivan, and Sieradzki allege that NLRK fraudulently misrepresented that the client list was an asset to be transferred and not shared under the Membership Interest Purchase Agreement. They aver that they reasonably relied on this representation to their detriment and were damaged because the confidentiality and value of the client list was compromised and diminished. As a result, they request compensatory and punitive damages as well as costs incurred in this action.

A party asserting a claim for fraudulent misrepresentation must prove by clear and convincing evidence:

> (1) A false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the misrepresentation.

*Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386, 114 Nev. 441, 447 (1998) (citations omitted). "With respect to the false representation element, the suppression or omission 'of a material fact which a party is bound in good faith to disclose is equivalent to a false representation, since it constitutes an indirect representation that such fact does not exist.'" *Nelson v. Heer,* 163 P.3d 420, 426, 123 Nev. 217, 225 (2007) (quoting *Midwest Supply, Inc. v. Waters,* 89 Nev. 210, 212-13, 510 P.2d 876, 878 (1973)).

First, there is no evidence that NLRK made a false representation to Hallberg, Sullivan, and Sieradzki that the lists would not be shared. There was testimony that Indoor Ag-Con had lists and that these were an asset, but there was no testimony that NLRK represented the lists would be shared or not shared. Sullivan expressed concerns about the quality of Kerslake's list, and referred to it as "trash," but he decided to proceed with the deal anyway. Kerslake sent an email to Pruitt specifically indicating that the list would be retained in case it was needed by Contain, and no action was taken to revoke NLRK's access to the list. Sullivan testified to an unwritten policy regarding access to the list, but this policy was never conveyed to Kerslake. Moreover, there was testimony about the value of such lists within the trade show industry, but Sullivan asserted that Kerslake did not have much experience in that industry.

Second, even if NLRK had made a false representation, no evidence was presented to support their claim they were damaged as a result.

1   Therefore, the fraudulent misrepresentation/omission claim of Hallberg, Sullivan, and

2   Sieradzki fails.

3   **C. Theft of Trade Secrets under NRS 600A.010 *et seq.* (Indoor vs NLRK)**

4   NRS 600A.010 *et. seq*. is Nevada's Uniform Trade Secrets Act (NUTSA). NRS

5   600A.010. NUTSA "prohibits the misappropriation of trade secrets and provides for a private

6   right of action for damages and injunctive relief." *ImageKeeper LLC v. Wright Nat'l Flood Ins.*

7   *Servs. LLC*, No. 2:20-cv-01470-GMN-VCF, 2021 WL 4466312, at *4 (D. Nev. Sept. 29, 2021).

8   "The elements of a misappropriation of trade secrets claim include: (1) a valuable trade

9   secret; (2) misappropriation of the trade secret through use, disclosure or nondisclosure of use of

10  the trade secret; and (3) the requirement that the misappropriation be wrongful because it was

11  made in breach of an express or implied contract or by a party with a duty not to disclose."

12  *Frantz v. Johnson*, 999 P.2d 351, 358, 116 Nev. 455, 466 (citations omitted).

13  The court need not decide whether the list qualifies as a trade secret because there is no

14  evidence of wrongful misappropriation.

15  The evidence reflects that despite testimony that the list was "gold," it was <u>not</u> referenced

16  in the purchase agreement documents. No one at Indoor ever communicated to NLRK that it was

17  not to access or utilize the list. Indoor made no effort to safeguard the secrecy of this information

18  with respect to NLRK. Kerslake told Pruitt that the list would be retained in case Contain needed

19  it, and Pruitt took no action and NLRK continued to have access to the list. Even when Sullivan

20  specifically told Pruitt that Kerslake should not have access to the list, no efforts were

21  undertaken to revoke her access to the list. While Indoor supposedly had a policy regarding

22  access and/or disclosure of the list, this policy was never conveyed to NLRK. NLRK had a need

23  to access the list in connection with the services it was providing under the Consulting

Agreement. While Pruitt testified she received an email suggesting NLRK had utilized Indoor's enhanced list, there was no evidence that the email was in fact sent to someone who was not on the original list (*i.e.*, evidence comparing Kerslake's original list to the enhanced list or testimony from the email recipient that he had not given his contact information to NLRK).

Finally, Indoor alleges that as a result of the misappropriation, it suffered damages and injuries, but no evidence was presented demonstrating that it was damaged as a result of NLRK accessing the list.

In conclusion, the court finds that Indoor's trade secret misappropriation claim fails.

**D. Unlawful Acts re: Computers under NRS 205.4765 (Indoor vs NLRK)**

Under the Nevada Computer Crimes Law (NCCL), a person who "knowingly, willfully and without authorization" "(a) Modifies; (b) Damages; (c) Destroys; (d) Discloses; (e) Uses; (f) Transfers; (g) Conceals; (h) Takes; (i) Retains possession of; (j) Copies; (k) Obtains or attempts to obtain access to, permits access to or causes to be accessed; or (l) Enters data, a program or any supporting documents which exist inside or outside a computer, system or network," or "who knowingly, willfully and without authorization: (a) Destroys; (b) Damages; (c) Takes; (d) Alters; (e) Transfers; (f) Discloses; (g) Copies; (i) Uses; (j) Retains possession of; or (k) Obtains or attempts to obtain access to, permits access to or causes to be accessed, a computer, system or network" is guilty of a misdemeanor." NRS 205.4765(1), (3). The statute allows any victim of a misdemeanor to sue the perpetrator. NRS 205.511(1).

The evidence demonstrates that Indoor knew that NLRK had access to the GetResponse account. Indoor continued to allow NLRK to access the account even when Sullivan said Kerslake should not be given the list, and well after Indoor terminated its relationship with NLRK. Therefore, it cannot be said that NLRK knowingly, willfully, and *without authorization*

used, accessed or retained possession of this information. As such, the court finds that Indoor's claim under NRS 205.4765 fails.

**E. Trespass to Chattels (Indoor vs NLRK)**

Indoor alleges that NLRK intentionally interfered with Indoor's use or possession of its support websites and related internal databases and systems.

A party alleging a claim for trespass to chattels must demonstrate the defendant: "(a) dispossesse[d] the other of the chattel, or (b) the chattel is impaired as to its condition, quality or value, or (c) the possession is deprived of the use of the chattel for a substantial time, or (d) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest." *Cerros v. North Las Vegas Police Dept.*, No. 2:-06-cv-006470-LRH-PAL, 2008 WL 608641, at *4 (D. Nev. Feb. 29, 2008) (quoting Restatement (Second) of Torts § 218).

The evidence demonstrates that Indoor knew NLRK had access to the GetResponse account. There was no evidence that Indoor was "dispossessed" of the information. Nor was evidence presented the demonstrates any impairment of the condition, quality or value or deprivation of use or other harm. As such, Indoor's trespass to chattel claim fails.

**F. Pre- and Post-Judgment Interest**

"In diversity cases …, the court looks to state law to determine the rate of prejudgment interest, while federal law determines the rate of postjudgment interest." *Lagstein v. Certain Underwriters at Lloyd's of London*, 725 F.3d 1050, 1055 (9th Cir. 2013) (citing *Northrop Corp. v. Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1155 (9th Cir. 1988) (per curiam)).

In Nevada, "[t]here items must be determined to enable the trial court to make an appropriate award of interest: (1) the rate of interest; (2) the time when it commences to run; and

1    (3) the amount of money to which the rate of interest must be applied." *Kerala Properties, Inc. v.*

2    *Familian*, 137 P.3d 1146, 1148-49, 122 Nev. 601, 604 (Nev. 2006). NRS 99.040 is the Nevada

3    statute that applies to cases involving contract disputes.

4         Post-judgment interest on a federal district court judgment is mandatory and runs from

5    the date of the judgment until the judgment is satisfied. 28 U.S.C. § 1961; *Planned Parenthood*

6    *of Columbia/Willamette Inc. v. Am. Coal. of Life Activities*, 518 F.3d 1013, 1017-18 (9th Cir.

7    2008).

8         The court will permit the parties to submit briefing on the calculation of pre- and post-

9    judgment interest, and then will amend the judgment accordingly.

## **ORDER**

11        IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

12   (1) Judgment is entered in favor of NLRK and against Indoor, Hallberg, Sullivan, and Sieradzki

13   on their counterclaims for breach of contract for the Membership Interest Purchase Agreement

14   and the Consulting Agreement, fraudulent misrepresentation/omission, theft of trade secrets

15   under NRS 600A.010, unlawful acts regarding computers under NRS 205.4765, and trespass to

16   chattels.

17   (2) Judgment is entered in favor of NLRK and against Hallberg, Sullivan, and Sieradzki on

18   NLRK's claim for breach of the Membership Interest Purchase Agreement, and NLRK is entitled

19   to recover $1 in nominal damages on this claim.

20   (3) Judgment is entered in favor of NLRK and against Indoor for NLRK's claim for breach of

21   the Security Agreement and Secured Promissory note, and NLRK is entitled to recover damages

22   in the amount of $200,000, plus simple interest at a rate of six percent through June 1, 2021 on

23   this claim.

(4) Judgment is entered in favor of NLRK and against Indoor on NLRK's claim for breach of the Consulting Agreement, and NLRK is entitled to recover damages in the amount of $10,000, plus interest at a rate of 1.5% per day as provided in the Consulting Agreement.

IT IS HEREBY FURTHER ORDERED that the Clerk shall enter judgment accordingly.

IT IS FURTHER ORDERED that NLRK has until **June 7, 2023**, to submit a brief that analyzes and calculates the pre- and post-judgment interest that should be awarded in this action. Indoor, Hallberg, Sullivan, and Sieradzki have until **June 14, 2023**, to submit a response. NLRK has until **June 21, 2023**, to file a reply brief. After reviewing the briefing, the court will direct the Clerk to enter an amended judgment reflecting the amount of pre- and post-judgment interest.

**IT IS SO ORDERED**.

Dated: May 30, 2023

_____
Craig S. Denney
United States Magistrate Judge